IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Richard M. Quilopras, | NO. C 05-04516 JW |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| James A. Yates, Warden, | |
| Respondent. | |

## I. INTRODUCTION

This matter is now before the Court for consideration of Richard Quilopras' ("Petitioner") Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, concerning his 2002 conviction for first degree murder with an arming enhancement in San Mateo County Superior Court. For the reasons set forth below, the Petition is DENIED as to all claims.

## II. BACKGROUND

**A.    Facts**

Nestor Parra ("Parra") was murdered in his home in South San Francisco at about 10:30 pm on Saturday, January 5, 1985, when he resisted an attempt to rob him.[1] Parra was killed by a single .22 caliber bullet fired into his chest. (Id.) The gun was not found. (Id.) Petitioner was present when Parra was shot, or, at least, seconds earlier. (Id.) He was not the gunman. (Id.) Both Parra and Petitioner were drug dealers, and Parra was a drug user as well. (Id.) On the night he was murdered, he was trying to buy drugs from Petitioner. (Id.)

---

[1] (Answer to Petition for Writ of Habeas Corpus at 3, hereafter "Answer," Docket Item No. 6.)

Parra was killed during a robbery masterminded by Petitioner and carried out by he and two friends, James Murphy ("Murphy") and Dennis Agan ("Agan"). (Appeal at 1.) Petitioner was convicted for his involvement based on the testimony of Agan, Ricardo Arno ("Arno"), and Linda Fowler ("Fowler"). (Id. at 1, 3-4.)

Petitioner, Agan, and Murphy had been friends for many years, and Agan was selling drugs for Petitioner as of January 1985. (Appeal at 1.) On January 3, 1985, Petitioner called Agan and asked him if wanted to make some money. (Id.) On January 5, Petitioner called again, after which the two went for a run along the beach. (Id. at 2.) Petitioner told Agan he would call again around 7:00 pm, and dropped Agan off near a pizza parlor. (Id.) Agan met some friends and drank beer, but was home before seven. (Id.) Petitioner called, telling Agan to be ready and just hang out in front. (Id.) Petitioner then drove up with Murphy. (Id.)

Petitioner explained that they were going to rob someone – Parra. (Appeal at 2.) The idea was to make it appear that Murphy and Agan were unconnected with Petitioner. (Id.) They were to tie up both Petitioner and Parra, but tie Petitioner only loosely. (Id.) Petitioner only had a little bit of twine, so Agan got some duct tape from his truck. (Id.) Petitioner handed Murphy a gun and Agan a knife. (Id.) Parra lived in a three-story townhouse with the garage on the first floor in which he would let people in by opening the garage door. (Id.) The plan was for Petitioner to buzz Parra's door. Parra would recognize Petitioner and open the garage. (Id.) Agan and Murphy were to run in after Petitioner. (Id.)

Petitioner, Agan, and Murphy drove to Parra's house, parking a couple of blocks away. (Appeal at 2.) Petitioner rang the doorbell. (Id.) Parra asked who it was, Petitioner responded, "Quilo" and the garage door opened. (Id.) Murphy and Agan ran in as the door began to go down. (Id.) They found both Petitioner and Parra there, and told them to get down. (Id.) They tied Petitioner's hands behind his back, loosely, and duct-taped Parra's hands behind his back. (Id.) They had the men get up. (Id.) Murphy stated yelling, "Where is the safe?" or "Where is the money?" (Id.) Parra did not answer. (Id.)

2

1   They all went up the stairway into Parra's home, where Agan and Murphy made the other
2 men lie on the floor.[2] Murphy placed a knee on Parra's back, holding him down. (Id.) He
3 continued to yell about the safe, and began to hit Parra on the back. (Id.) Parra got loose and
4 grabbed Murphy's legs. (Id.) There was a scuffle, Agan grabbed Parra's legs, and poked at Parra
5 with the knife. (Id.) He was kicked off, and heard Murphy's gun go off. (Id.) Murphy said, "Fuck,
6 it wasn't supposed to happen like this." (Id.) Parra fell back, holding his right side. (Id.) The
7 others had some trouble figuring out how to get out of the house, but finally Petitioner led the way
8 down the stairs. (Id.)

9   Agan and Murphy ran back towards the car. (Appeal at 3.) Agan did not know where
10 Petitioner was. (Id.) They ran into another individual, and Agan thought he might have said,
11 "What's up?" but they did not see anyone else. (Id.) The car wasn't where they had left it. (Id.)
12 Agan and Murphy headed back towards Parra's residence, burying the gun along the way. (Id.)
13 They could not find Petitioner, so they went to his house. (Id.)

14   During the incident, Parra's friend Arno was in the home. (Appeal at 3.) Parra had invited
15 Arno over to discuss a drug deal. (Id.) He told Arno that he expected a delivery of cocaine later that
16 evening. (Id.) Parra then called a man Arno knew as "Quilo," whom he later identified as
17 Petitioner, about purchasing cocaine. (Id.) The doorbell rang about one-half hour later. (Id.) Arno,
18 at Parra's request, went upstairs to one of the bedrooms. (Id.) He could hear Parra and Petitioner
19 engaged in a somewhat heated argument. (Id.) Petitioner left five minutes later. (Id.) Arno went
20 back downstairs, and Parra told him that he would be purchasing the cocaine from Petitioner. (Id.)

21   The doorbell rang an hour or so later. (Appeal at 3.) Parra went to the window, confirmed
22 that Petitioner had returned, and opened the garage door. (Id.) A scuffle broke out. (Id.) Arno
23 heard people come up the stairs into the kitchen area, and heard someone say something like,
24 "Where is the safe? Open the safe or I'll blow your brains out." (Id.) He heard Petitioner say

---

[2] (See Answer, Ex. F, State Appeals Court Opinion filed on May 25, 2004, in People v. Richard Quilopras, No. A099709, hereafter, "Appeal," Docket Item No. 23.)

1  something like, "You've got to open the safe, Nestor. They have a gun." (Id.) Arno heard another
2  man's voice as well. (Id.) The fighting got quite loud, and Arno, using it to cover his actions,
3  climbed out a window. (Id.) As he did so, he heard a gun go off. (Id.)

4  Arno ran to the home of a friend, hoping to use the telephone, but he found only a babysitter
5  there, so he returned to his car near Parra's house. (Appeal at 3.) As Arno went back towards
6  Parra's house he ran into two men (presumably Agan and Murphy) who asked Arno what was going
7  on, but walked on, giving the agitated Arno a wide berth. (Id.) Petitioner drove up as Arno started
8  to get into his car. (Id.) Arno told Petitioner that he thought Parra had been shot. (Id.) Petitioner
9  said, "I know, I know." (Id.) They went inside and found Parra lying in a pool of blood near the
10 dining area. (Id.) As Arno knelt over Parra, Petitioner seemed to be doing something in the area of
11 the kitchen counter. (Id.) Arno wanted to call 911, but Petitioner said that the telephone line had
12 been cut. (Id. at 3-4.) Arno mentioned a second telephone, but Petitioner said the line to that phone
13 also had been cut. (A police investigator confirmed that the line to one of the telephones had been
14 cut. The other line and telephone, however, were undamaged.) (Id. at 4.) Arno insisted that they
15 find a public telephone and call from there. (Id.) Each man drove his car to a nearby gas station,
16 where they discovered the police already had arrived. (Id.)

17 Also during the incident, Parra's friend Fowler was dropped off at Parra's house at 10:20 pm
18 on the night of his murder. (Appeal at 4.) She heard a lot of noise and banging in the residence as
19 she walked up the drive, and heard Parra screaming. (Id.) The garage door was up and a car was in
20 the driveway. (Id.) Petitioner ran out, holding one hand up as if he was holding something about
21 the size of a football under his jacket. (Id.) Petitioner told her that Parra was being robbed. (Id.)
22 Petitioner then got into his car and drove off. (Id.) Other men came out of the door. (Id.) Fowler
23 ran down the street to a gas station where she called the police. (Id.) She was there when the police
24 arrived, and when Arno and Petitioner arrived a few minutes later (Id.)

25 The police found Parra lying face down in an area between the living room and dining area
26 of his home. (Appeal at 4.) He was lying in a pool of blood and had duct tape around one of his

4

wrists. (Id.) Parra died from a single shot to the chest that had gone through his pulmonary artery and aorta. (Id.) He also had various scrapes and bruises, including a number of small puncture wounds on his right forearm and several linear scrapes, two curved deeper scrapes and two superficial puncture marks on his back, consistent with having been jabbed at with the tip of a knife. (Id.) There was a lot of blood in the kitchen, and additional blood stains in the living room and dining area. (Id.) The police found a partially opened safe in the kitchen, with nothing inside it. (Id.)

The police, with Petitioner's consent, searched his car, finding Agan's wallet in the glove compartment. (Appeal at 4.) Petitioner told police that he had gone to Parra's residence to deliver drugs. (Id.) After Parra opened the door to the garage, Petitioner and Parra were attacked by two armed men in the area of the stairs leading upstairs to the living area. (Id.) Petitioner tried to get away, but both he and Parra were made to lie down on the floor of the dining area. (Id. at 4-5.) The men taped Parra. (Id.) They took money and the drugs Petitioner had brought. (Id.) They demanded the location of the safe, and were told it was in a cabinet. (Id.) They told Petitioner to open it, but he was unable to do so. (Id.) In the meantime, Parra was resisting. (Id.) One man told the other to "stick" him, a struggle followed and Petitioner was able to escape. (Id.)

A few days later, Agan went to the police station to retrieve his wallet. (Appeal at 5.) He told the police that he had left it in Petitioner's glove compartment when the two had gone jogging, and that he knew nothing about Parra's murder. (Id.)

In 1999, Fowler picked Agan out of a photographic lineup as one of the men she had seen leaving Parra's residence. (Appeal at 5.) She identified Murphy in a second lineup as looking familiar, and later told the police that she could make a positive identification of him. (Id.)

**B.  Case History**

In 2002, a jury found Petitioner guilty of first-degree murder, pursuant to California Penal Code § 187, and of the special circumstance of being armed, pursuant to Cal. Pen Code § 12022(a)(1). (Answer at 1.) Petitioner was sentenced to twenty-six years to life, which would be

1  consecutive to a prior murder conviction.  (Id. at 2.)  On May 25, 2004, the California Court of
2  Appeal affirmed Petitioner's conviction after Petitioner filed an appeal.  On August 11, 2004, the
3  California Supreme Court denied his petition for review.  (Id.)  On November 4, 2005, Petitioner
4  filed this Petition for a Writ of Habeas Corpus.[3]

## III.  STANDARDS

Petitioner filed his petition for writ of habeas corpus in this Court on June 18, 2002, and filed his amended petition for habeas corpus on November 10, 2004.  Accordingly, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposes a "new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus."  Williams v. Taylor, 529 U.S. 362, 412 (2000).

Under the AEDPA, a district court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits in state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state court decision."  Williams, 529 U.S. at 412; Lockyer v. Andrade, 538 U.S. 63, 71 (2003); see Alvarado v. Hill, 252 F.3d 1066, 1068-69 (9th Cir. 2001).  Section 2254(1) "restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  Williams, 529 U.S. at 412.

---

[3] (See Petition for Writ of Habeas Corpus at 1, hereafter "Petition," Docket Item No. 1.)

6

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, at 412-13. "Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, at 411. The objectively unreasonable standard is not a clear error standard. See Andrade, 538 U.S. at 75 (rejecting the Ninth Circuit's use of clear error standard in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)). Conflating the "objectively unreasonable" standard with the "clear error" standard "fails to give proper deference to state courts." Id. After Andrade, "[t]he writ may not issue simply because, in [the federal habeas court's] determination, a [s]tate court's application of federal law was erroneous, clearly or otherwise." Id. at 75-76.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and made part of the state-court record. See Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of

1 appeals, rather than by a state trial court.  See Sumner v. Mata, 449 U.S. 539, 546-47 (1981); Bragg
2 v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir. 2001).

3 Finally, habeas relief is warranted only if the constitutional error at issue is a structural error
4 or had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v.
5 Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).
6 Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but
7 they are not entitled to habeas relief based on trial error unless they can establish that it resulted in
8 "actual" prejudice.  Brecht, 507 U.S. at 637.

9 Where, as in this writ, the California Supreme Court denies review of Petitioner's claim
10 without explanation, the Court looks to the last reasoned state court decision in conducting habeas
11 review.  See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citation omitted) (the
12 district court "looks through" the unexplained California Supreme Court decision to the last
13 reasoned state court decision), cert. denied, 534 U.S. 944 (2001).  The California Court of Appeal
14 rendered the last reasoned state court decision in Petitioner's case.

### IV.  DISCUSSION

16 Petitioner raises five challenges to his conviction: (1) improper rejection of Petitioner's
17 collateral estoppel claim; (2) improper disregard of Petitioner's right to advise the jury of witness's
18 credibility; (3) improper rejection of evidence of Murphy's acquittal; (4) improper allowance of
19 witness testimony; (5) violation of due process in allowance of a prior conviction as impeachment
20 evidence.  The Court considers each ground in turn.

**A.     Collateral Estoppel**

22 Petitioner contends that his right against double jeopardy was violated because the state court
23 unreasonably applied United States law in convicting him after a separate jury acquitted his co-
24 perpetrator.  Petitioner contends that since the facts of the case were litigated for Murphy that the
25 doctrine of collateral estoppel prevents the facts from being litigated again in his case.

The constitutional guarantee against double jeopardy includes the concept of collateral estoppel. See Ashe v. Swenson, 397 U.S. 436, 445 (1970); United States v. James, 109 F.3d 597, 600 (9th Cir. 1997); Newton v. Superior Court of California, 803 F.2d 1051, 1057 (9th Cir. 1986), cert. denied, 481 U.S. 1070 (1987). Collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe, 397 U.S. at 443.[4] Collateral estoppel analysis involves a three-step analysis:

> First, the issues in the two actions are identified so that we may determine whether they are sufficiently similar and material to justify invoking the doctrine. Second, we examine the first record to determine whether the issue was fully litigated. Finally, from our examination of the record, we ascertain whether the issue was necessarily decided.

James, 109 F.3d at 600 (quoting United States v. Schwartz, 785 F.2d 673, 681 (9th Cir. 1986). When an element of the crimes charged in successive prosecutions is identical, the "similar and material" prong is satisfied. United States v. Ford, 371 F.3d 550, 556 (9th Cir. 2004) ("objective activity" requirements under sections 21 U.S.C. § 856(a)(1) and (a)(2) are identical). The determination of whether the issue was "necessarily decided" turns on whether an issue of fact or law was "actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment." Bobby v. Bies, 129 S. Ct. 2145, 2152-53 (2009) (internal citation omitted).

The earlier determination (whether it be by judge or jury) must be given the most rational interpretation possible. See United States v. Carbullido, 307 F.3d 957, 961-62 (9th Cir. 2002) (judge's decision at bench trial finding defendant not guilty by reason of insanity of the one arson charged precluded a second prosecution for another arson in the string of nine arsons listed in the stipulation of facts upon which the judge's decision rested). The petitioner bears the burden of showing that the issue whose relitigation he wishes to foreclose in a second proceeding was actually

---

[4] The government is entitled to litigate a case under alternative theories of the crime. Williams v. Warden, 422 F.3d 1006, 1011 (9th Cir. 2005). Simultaneous convictions and acquittals on such different theories in a single trial do not violate the principle of collateral estoppel embodied in the Double Jeopardy Clause. Id.

decided in the first one, and that no rational jury could have grounded its verdict on an issue other than the one the petitioner seeks to foreclose. Santamaria v. Horsley, 133 F.3d 1242, 1246 (9th Cir. 1998) (en banc), amended, 138 F.3d 1280 (9th Cir. 1998); see, e.g., Wilson v. Bellevue, 554 F.3 816, 829-30 (9th Cir. 2009) (acquittal on intentional murder theory did not demonstrate that the jury necessarily decided issues that would bar a later prosecution on a felony murder theory under Oregon law).

In a federal habeas proceeding involving a claim that retrial of the allegedly precluded issue would violate double jeopardy protections, the preclusive effect of the first jury verdict is a question of federal law but the state's highest court's interpretations of state law are binding. Santamaria, 138 F.3d 1245. Finally, if a petitioner has presented his collateral estoppel/double jeopardy claim to the California Court of Appeal and to the California Supreme Court, this court may address the claim; petitioner does not have to wait until he is retried to seek federal habeas relief. See id. at 1243; Thomas v. Municipal Court, 878 F.2d 285, 287 n.1 (9th Cir. 1989).

Here, relying on Ashe v. Swenson, 397 U.S. 436 (1970), Petitioner contend that the state court misapplied Supreme Court law by allowing the prosecution of Petitioner on the theory of aiding and abetting a felony-murder after acquitting the actual shooter. (Petition at 13.) In Ashe, the United States Supreme Court held that a person cannot be convicted of a crime if that person was already acquitted of that same crime, even if there was a separate victim to that same crime. See Ashe, 397 U.S. at 444-445. Here, the Court of Appeal ruled that Ashe did not apply, and therefore did not support Petitioner's claim. (Appeal at 6.) Instead, the court found Standefer v. United States, 447 U.S. 10 (1980, more applicable. (Id.) Standefer stands for the proposition that the doctrine of non-mutual collateral estoppel does not apply to criminal cases. 447 U.S. at 25-26. Thus, the Court of Appeal concluded that based on Standefer and Ashe, Petitioner was properly tried and convicted. (Appeal at 12.)

Petitioner makes no claim as to how the state court unreasonably applied United States law or that the state court used law contrary to current United States law. The Court finds that the state

10

court properly used the Standefer doctrine to hold that non-mutual collateral estoppel did not apply. Thus, Petitioner has not shown a violation of his Fifth Amendment rights against double jeopardy.

Accordingly, the Court denies the Petition on this ground.

**B.** **Confrontation Clause & Due Process**

Petitioner contends that the trial court violated his rights to confrontation and to present evidence by refusing to inform the jury or allow Petitioner to inform the jury of Murphy's acquittal in a separate trial. Petitioner argues that this denial prejudiced the outcome of his case.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Id.; see Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. Crawford, 541 U.S. at 61; see, e.g., United States v. Medjuck, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses).

The Confrontation Clause applies to all "testimonial" statements. See Crawford, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (citations and quotation marks omitted); see id. ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause

11

applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. Crawford, 541 U.S. at 50-51. This includes the admission of affidavits reporting the results of forensic analysis which fall into the "'core class of testimonial statements'" described in Crawford. Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2544-45 (2009) (quoting Crawford, 541 U.S. at 54).

To determine whether a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether: "(1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted).

Finally, to obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was one of constitutional dimension and that it was not harmless under Brecht. The petitioner would have to show that the error had "'a substantial and injurious effect' on the verdict.'" Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).

Here, the Court of Appeal held as follows:

> The jury's task is to determine for itself the veracity of a witness's statements. Evidence that some other person or some other jury at another proceeding did not believe the witness does nothing to aid the jury in this task. To the contrary, it can only interfere with the duty of the jurors to form their own opinions on that question.

(Appeal at 12.) The court went on to cite state precedent and statutes prohibiting lay opinion testimony as to witness credibility, to hold that "the trial court properly refused to allow Petitioner to inform the jury of Murphy's acquittal as a means of impeaching Agan, or to call jurors from Murphy's trial as witnesses to state the opinions of Agan's credibility as a witness or of the veracity of his statements." (Id.)

Petitioner relies on two cases, Crane v. Kentucky, 476 U.S. 683 (1986), and Delaware v. Van Arsdall, 475 U.S. 673 (1986) to support his contention that he had a right inform the jury that Murphy was acquitted. (Petition at 13.) The Court finds that neither case raised by Petitioner

12

1  supports his position that he was unable to confront the evidence against him.  In Crane, the
2  Supreme Court found that the trial court violated the defendant's due process by excluding
3  competent, reliable evidence bearing on the credibility of the defendant's confession when such
4  evidence was central to the defendant's claim of innocence.  476 U.S. at 690.  In Van Arsdall, the
5  Supreme Court found that the trial court violated the defendant's due process when it prohibited all
6  inquiry into the possibility that the prosecution's witness would be biased as a result of the state's
7  dismissal of the witness' pending public drunkenness charge.  475 U.S. at 673.  Thus, both cases are
8  distinguishable to the facts of this case.

9       In sum, as with the Court of Appeal, the Court finds that Petitioner has failed show that there
10 was an error of constitutional dimension and that it was not a harmless error under Brecht.  507 U.S.
11 at 623.

12      Accordingly, the Court denies the Petition on this ground.

13 **C.**    **Ineffective Assistance of Counsel**

14      Petitioner contends that the trial court's restriction of trial counsel from introducing evidence
15 of Murphy's acquittal was a violation of his right to effective counsel.  "Further, Petitioner contends
16 that if arguments supporting Claims One and Two were not preserved, that such failure to preserve
17 was the error of trial counsel and therefore he was denied his Sixth Amendment [r]ights."  (Petition
18 at 11.)

19      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth
20 Amendment right to counsel, which guarantees not only assistance, but effective assistance of
21 counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any
22 claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of
23 the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  The
24 right to effective assistance counsel applies to the performance of both retained and appointed
25 counsel without distinction.  See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

13

To prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. See Williams (Terry) v. Taylor, 529 U.S. 362, 404-08 (2000). It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot even establish incompetence under the first prong. See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

Here, the record reflects that Petitioner's counsel at trial introduced motions to allow evidence of Murhpy's acquittal, and jurors' testimony to discredit Agan.[5] Petitioner does not present any evidence that his counsel made errors. Nor does Petitioner show that his counsel was unreasonable in making decisions. Thus, Petitioner has not overcome the strong presumption that counsel's conduct fell within reasonable professional norms.

Accordingly, the Court denies the Petition on this ground.

**D.** **Admission of Dennis Agan's Testimony**

Petitioner contends that the admission of Agan's testimony violated his due process rights. Petitioner contends that Agan was required to testify to the police version of events rather than truthfully.

---

[5] (Traverse to Answer to Petition for Writ of Habeas Corpus at 14, hereafter "Traverse," Docket Item No. 24.)

1    The admission of evidence is not subject to federal habeas review unless a specific
2 constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the
3 fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th
4 Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839 (1986). The
5 Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial
6 evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v.
7 Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant
8 pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary
9 to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

10    Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for
11 granting federal habeas relief on due process grounds. See Henry, 197 F.3d at 1031; Jammal v. Van
12 de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state evidentiary rules suggests
13 that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial
14 even when state standards are violated; conversely, state procedural and evidentiary rules may
15 countenance processes that do not comport with fundamental fairness. See id. (citing Perry v.
16 Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)). The due process
17 inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial
18 that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.
19 1995); Colley, 784 F.2d at 990. But note that only if there are no permissible inferences that the jury
20 may draw from the evidence can its admission violate due process. See Jammal, 926 F.2d at 920.

21    Here, the Court of Appeal has rejected Petitioner's claim, citing state law for the proposition
22 that "the testimony of an accomplice who has received a favorable plea agreement in return for his
23 or her testimony is not so inherently unreliable as to render it inadmissible." (Appeal at 13.) The
24 court also found that "[n]othing in the terms of the bargain . . . suggests that Agan was under any
25 compulsion to testify in any particular way." (Id.)

15

Further it is well established that, "[T]he practice of taking into consideration, in sentencing an accomplice, . . . aid to the state in turning state's evidence can be no denial of due process to a convicted confederate." Lisenba v. California, 314 U.S. 219, 226 (1941). As long as a witness, whether an informant or otherwise, is allowed to be cross-examined, it does not matter if he or she has motives to lie. Hoffa v. United States, 385 U.S. 293, 311-12 (1966). Here, the record reflects that Agan was cross-examined and had impeachment evidence brought against him. (See Petition at 11-12.) Petitioner was not barred from informing the jury of any benefits given to Agan for his testimony. (See Petition at 12.) Since the Court of Appeal applied law almost identical to the current federal law, there has been no contrary or unreasonable application of the laws or Constitution of the United States.

Accordingly, the Court denies the Petition on this ground.

E.  **Petitioner's Right to Testify**

Petitioner contends that he was denied his right to testify because the trial court ruled that he could be impeached by his prior murder conviction. Petitioner contends that the Court of Appeal unreasonably applied United States law in ruling that Petitioner waived his right to appeal this issue because he did not testify during his trial.

The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution. It is one of the rights that "are essential to due process of law in a fair adversary process." Rock v. Arkansas, 483 U.S. 44, 51 (1987) (citing Faretta v. California, 422 U.S. 806, 819, n.15 (1975)). It is a fundamental Constitutional right. See id. at 53 n.10. The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony. See id. The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call "witnesses in his favor." See id. at 52. Logically included in the accused's right to call witnesses is a right to testify himself, should he decide it is in his favor to do so. See id. There is no justification for a rule that denies an accused the opportunity to offer his own testimony. Rather, his

16

veracity can be tested adequately by cross-examination. See id. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness. See id. The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. See id. Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. See id.

Impeachment of a witness' testimony, allowing the jury to draw a negative inference, or partial striking of testimony may be preferable to striking the witness' entire testimony where there has been a refusal to answer relevant questions on cross-examination. See People v. Hecker, 219 Cal. App. 3d 1238 (1990); People v. Reynolds, 152 Cal. App. 3d 42 (1984). In Luce v. United States, 469 U.S. 38, 43 (1984), the Supreme Court held that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify.

Here, the Court of Appeal found that the Petitioner waived any error in the trial court's ruling by not testifying. (Appeal at 16.) The United States Supreme Court has held that it is permissible to require that a defendant be put to the choice to testify or to be impeached by admission of prior crimes. See McGautha, 402 U.S. at 215. Thus, the Court of Appeal has correctly held that Petitioner, in electing to not testify at trial, has waived his appeal rights of this issue. The Court finds that this holding is not contrary to or unreasonable application of the laws or Constitution of the United States.

Accordingly, the Court denies the Petition on this ground.

## V. CONCLUSION

The Court DENIES the Petition for Writ of Habeas Corpus as to all grounds. Judgment shall be entered accordingly.

Dated: December 18, 2009

JAMES WARE
United States District Judge

17

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alison Minet Adams shark@rain.org
Gerald August Engler Gerald.Engler@doj.ca.gov
Jeremy Friedlander Jeremy.Friedlander@doj.ca.gov
Peggy S. Ruffra peggy.ruffra@doj.ca.gov

**Dated: December 18, 2009**                                **Richard W. Wieking, Clerk**

                                                       **By:** **/s/ JW Chambers**
                                                               **Elizabeth Garcia**
                                                               **Courtroom Deputy**